## MOSES PROFFIT *v.* THE STATE.

CHARGE OF THE COURT. — When the general charge of the court covers all the different phases in which the case may be legitimately considered, in the light of the evidence, and presents the law applicable thereto in a clear and fair manner, it is not error to refuse special instructions.

APPEAL from the District Court of Harrison. Tried below before the Hon. A. J. BOOTY.

The appellant is charged by indictment with the murder of George Willis, in Harrison County, on October 1, 1874. He was convicted of murder in the second degree, and the punishment assessed against him, was confinement in the penitentiary for a term of twenty years. He and the deceased were freedmen.

Philip Brown, for the State, testified that he knew both deceased and appellant, and pointed the latter out to the jury. He remembers the day of deceased's death. On the morning of that day the deceased, who had been absent

from the neighborhood some months, came to the house of
witness and asked for the woman Joanna, with whom he
had lived for many years before he went off, and whom he
had left, when he went off, cropping with witness.   Wit-
ness told deceased that the woman had lived with him (wit-
ness) ever since deceased left, until about two weeks pre-
vious, when she married appellant, and was now living and
cropping with appellant.   At this the deceased became
very angry, and, after making several threats, said that
he was going to her and get the things which he had given
her.   Witness cautioned deceased to do nothing wrong, and
tried to dissuade him from it, inviting him at the same time
to enter his (witness's) house and partake of breakfast.
Deceased declined this invitation, and went off.

The next time witness saw deceased he was being
chased by three or four dogs, and by the appellant, through
a little strip of woods, down into the cotton-patch of wit-
ness, and towards a creek which runs between the place
witness then occupied and Mr. William Winston's.   At a
point in a lane which runs north from the house of witness,
and distant about one hundred and fifty yards, appellant
dismounted from the horse he was riding, and with the dogs
jumped the western fence of the lane.   Appellant then
whooped the dog on the deceased, and they all ran down
through the strip of woods, down the hill, and into witness's
cotton-patch, in the creek bottom.   When the chase first
commenced witness heard a pistol-shot, and almost imme-
diately afterwards heard another, and both sounded from
the direction in which the parties were running.

The dogs commenced barking and pursuing deceased as
soon as appellant whooped at them, and at the same time
witness, who was some two hundred yards distant, started
across to intercept the parties, and prevent a difficulty if
possible.   When witness got down below the brow of the
hill, and into the cotton-patch, he found deceased lying down

on the ground, which showed marks of a struggle. When witness took hold of his head the deceased said: " Uncle Philip, take care of my things, and lay me down." Witness then noticed lying near him a dirk-knife, and a pistol, in which there remained two loads, which witness shot off. Just before witness got to where deceased was lying, he saw appellant sitting astride a fence, and heard him cry " help " just before he was seen by witness. Witness soon went to appellant, and found him badly stabbed in three or four places about the hips, abdomen, and side, and bloody from the waist down. Appellant was taken to witness's house, where he remained until he got well enough to go about, — some four weeks. Witness examined the body of deceased, and found a bullet-hole in his back and one in front, as if a bullet had passed entirely through his body. The hole in the back was somewhat higher up than the one in front.

The woman Joanna is the step-daughter of witness, — the daughter of his wife Caroline, — and since the " surrender," up to the time of deceased's leaving the neighborhood, had lived openly and notoriously as the wife of the deceased. Witness, from where he was when he saw appellant and the dogs jump the fence, could, and did, see George Campbell in the cotton-patch which said Campbell cultivated on Mr. Steve Terry's land, across the lane ; and could, and did, see John James in the cotton-patch of witness, near the bridge, some three or four hundred yards from the house of witness. From where George Campbell was it was some one hundred and fifty yards to where appellant and the dogs jumped the fence. This happened in Harrison County, Texas.

On cross-examination, the witness said that the deceased, on the morning he called at the house of witness, threatened appellant, and talked very rough about him ; and that the reason he (witness) attempted to dissuade him was

because he feared he would do something wrong, as most any man would when another man had married his wife; had known deceased, appellant, and Joanna many years,— the first and last since before the war. Witness also testified that the deceased was a man of violent and dangerous character, and feared by both white and black people.

John James, for the State, testified that he remembered the day the deceased was killed. It was about nine o'clock on a cold, frosty morning, during the latter part of the year 1874. On that morning witness was in the Tom Terry field, cultivated then by Philip Brown, at a point south and west of, and near the bridge that crosses the creek in the lane that runs between Philip Brown's and W. E. Winston's places. Witness saw appellant riding across the bridge, followed by several dogs, and going towards Philip Brown's house. He had a pistol in his hand, and asked witness if he had seen the deceased that morning. Witness answered, "No;" to which appellant responded, "I am going to kill the d—n son of a b—h as soon as I see him." Appellant then rode on towards Philip Brown's, followed by the dogs, until he reached a point of the hill between where witness was and Brown's house, at which point he dismounted, and, with the dogs, got over the fence on the west side of the lane into Brown's wood-lot, when witness heard him whoop to the dogs, and heard the dogs yelp. Witness then saw appellant and the dogs running in a north-west direction, when presently they became lost to sight. Presently witness heard two shots, in rapid succession. Saw no more of deceased and appellant until he saw deceased dead and appellant wounded. Deceased was lying dead in Brown's field when witness got to him, with a bullet-hole through from his back to his chest. When appellant was carried to Brown's house, wounded, witness was asked to go for a doctor, which he did. Afterwards, and while wounded, appellant asked witness if deceased was dead,

and upon being told that he was, responded that he (appellant) "was glad of it." The woman Joanna and deceased had lived together as man and wife for a long number of years before deceased left the neighborhood, some months before, and had generally been recognized as man and wife. Witness had been summoned before the grand jury in this case this fall, by a deputy sheriff.

On cross-examination, witness stated that he did not refuse to go for the doctor, when asked, for appellant, and did not say that appellant had as well die as deceased. Witness saw Mr. Steve Terry at Brown's house while appellant was there wounded, and told him that he (witness) had seen appellant and the dogs jump the fence, heard the appellant whoop on the dogs, heard them yelp, heard two shots, and saw deceased dead; and thinks he told him that appellant told him (witness) on the bridge that he (appellant) intended to kill deceased, having at the time a pistol in his hand.

George Campbell, on the part of the prosecution, testified that on the morning of the killing he was picking cotton in Steve Terry's cotton-patch, east of the lane and south of the bridge and creek. He saw the appellant riding from the direction of Philip Brown's house towards W. E. Winston's, and, as he passed through the lane, heard him say he was "going after a pistol, and kill the son of a b—h." Witness saw him again, coming from towards Winston's, with three or four dogs following him; saw him dismount, tie his horse, and, with his dogs, get over into Philip Brown's field, and heard him whoop on the dogs; heard the dogs yelp, and then saw deceased running, with the dogs and appellant after him. When the appellant was within fifty yards of deceased, witness saw him extend his arm, in the hand of which he saw a pistol, and heard a report. Appellant continued to run after the deceased, and shortly witness heard another shot. On going over the

hill, witness found deceased dead in the field, shot through the body, and appellant badly wounded. Witness was some 400 yards distant when he heard appellant threaten deceased. Deceased was running down a steep hill when witness first saw him, with the dogs after him, and appellant fired first as they were going down this hill.

On cross-examination, the witness reiterated what he said on his examination in chief; but added that appellant was talking to himself, in an ordinary conversational tone, when witness, 400 yards distant, heard him say he would "kill the son of a b—h."

Giles Foster, for the State, testified that he knew the deceased and Joanna, and that they lived together as man and wife during the war, and afterwards until deceased left the neighborhood, some months before the killing.

On cross-examination, he said that himself and deceased belonged to the same man — Dr. Harris — in slave-time, and that he went with deceased to Mr. Godbold, who owned Joanna, when deceased asked Mr. Godbold for her. Consent was given, and the witness knows deceased and Joanna lived always after that as man and wife, up to the time deceased left the neighborhood. Witness could name no place where they so lived.

Caroline Brown, for the defence, testified that she is the wife of Philip Brown, and the mother of Joanna by another man. Joanna had lived with Philip Brown up to three or four weeks previous to the killing, when she married appellant and moved over to the Winston farm. On the day of the killing she (Joanna) had come over to Brown's to cook for the men who were picking cotton, and appellant came over with her. Appellant went into the kitchen to build a fire, preparatory to the preparation of breakfast, and while out there deceased came in and asked witness and Joanna whose horse that was hitched at the gate. Witness answered that it was appellant's. Deceased then asked

Joanna if she had married appellant, and on being answered in the affirmative, said : " I will kill him before the sun goes down, or he will kill me." Deceased then displayed a dirk-knife, and started out of the house ; but hearing a noise in the kitchen, asked, "Who is that?" Witness answered that it was appellant. Deceased turned immediately towards the kitchen and started in, but witness and Joanna got before him, and begged him to go away and have no fuss during Brown's absence. Deceased persisted in his efforts to get into the kitchen, but finally turned and went off. Appellant heard all that the deceased said, and saw him making efforts to get into the kitchen. Some time after deceased went off, appellant got on his horse and rode off, and witness saw no more of him until he was brought to Brown's house, badly wounded. Saw no more of deceased. Between ten and eleven o'clock, to the best of witness's belief, she heard a shot ; saw nor heard no dogs. Joanna never claimed deceased for her husband, that witness knows of.

On cross-examination, she said appellant had a pistol when he left the house. Witness heard the shot a few minutes after appellant rode off, in a north-westerly direction from Brown's house.

Joanna Proffit, wife of appellant, testifying for the defence, corroborated the testimony of the last witness entirely, but added that when deceased left Brown's house she went into the kitchen and told the appellant what he had said, but that appellant had both heard and seen the deceased. Witness further stated that when appellant left the house he said he was going home. Witness saw appellant no more until he was brought back badly wounded, and then she asked John James to go for the doctor, which he refused to do, until she begged and entreated him. Both James and Philip Brown said appellant had as well die as deceased. When witness got home, she found that some

one had broken into her house and taken off everything she had, except a large bedstead, and a box which was burned. Had never lived with deceased as his wife in Shreveport. On cross-examination, she testified that she had not seen deceased, before the day of the killing, for eight or nine months.

Dr. O. Knox, for the defence, testified that deceased and Joanna had never lived together as man and wife, though he has heard it said in the neighborhood, since the war, that deceased claimed her as his wife. Joanna lived on witness's place in 1863 or 1864, and deceased did not then claim her as his wife, though witness thinks he was at his house twice while Joanna was there, but does not know that deceased came to see Joanna; thinks, however, that he did. Has known deceased many years. He was a violent and dangerous man, and the terror of the neighborhood to both white and black. Knows Giles Foster, whose reputation for truth and veracity is bad, and who is not to be believed on oath.

William Winston, for the defence, testified that he has known appellant for thirty years, and has never known a more quiet and peaceable man. He had married Joanna about three weeks before the death of deceased; lived then, and lives now, on witness's place. Witness's dogs were in the habit of following him. Did not borrow witness's pistol on the day of the killing. Witness noticed on that day that the house of appellant and Joanna, which is on his place, had been recently broken into, through the window; and saw, also, that things of appellant and Joanna had been taken out and freshly burned.

Stephen Terry, for the defence, testified that he owned the place opposite the Tom Terry place, on which Philip Brown lived in 1874. A lane runs between the places; witness's farm lay on the east and Tom Terry's on the west of the lane. The west boundary-line of witness is a

levee, from five to six feet high, with a plank fence about three feet high on top of the levee. After getting off the bridge in the lane, going south, a person travelling on foot could not be seen for several hundred yards. If the person travelling the lane were on horseback, any one from the field might see the top of the rider's head — certainly not more than from the shoulders up — until such rider should get on top of the hill where Brown lived. Witness was in the field when deceased was killed, near the bridge; did not see either deceased or appellant on that day; thinks if any one on horseback had crossed the bridge that day, and stopped on it to talk to another, he would certainly have seen him. Witness heard a gun fire on the morning of the day deceased was killed, but heard no dogs yelping, nor heard any one whooping dogs. On that evening Philip Brown sent for witness, and told him deceased was dead. Witness found deceased dead in the field, near a spot where the ground indicated a struggle. Deceased appeared to be shot through his body, from his back. Witness tracked the blood clear up to Brown's house, where he found appellant wounded. Saw Philip Brown, John James, and George Campbell at the house, all of whom told witness they didn't know how it occurred; that they saw the dogs jump the fence and defendant running, which was all they knew about it. Knew deceased well; he was a violent and dangerous man, — the terror of white and black people of the whole neighborhood.

No brief for the appellant has reached the reporters.

*George McCormick*, Assistant Attorney-General, for the State.

WHITE, J. Appellant, Moses Proffit, was indicted by the grand jury of Harrison County on November 28, 1877, for the murder of one George Willis, alleged to have been committed by the accused on October 1, 1874.

The trial, which concluded on December 21, 1877, resulted in defendant's conviction of murder in the second degree, with his punishment assessed at twenty years' confinement in the penitentiary, and judgment was rendered accordingly.

The case seems to have been tried with more than ordinary care and ability, and a most thorough examination of the record convinces us that the errors complained of are not maintainable. A principal ground of complaint is the refusal of the court to give in charge to the jury the special instructions asked by defendant. It is not necessary that we should discuss these instructions. Suffice it to say that the general charge, as given, covered all the different phases in which the case could be legitimately considered in the light of the evidence, and presented the law applicable thereto in a most clear, forcible, and able manner, and certainly with great fairness for the defendant. Such of the special instructions as were not embraced in the charge were, in our opinion, not a part of the law of the case, or were not warranted by the facts proven. The court, therefore, did not err in refusing to give them.

The defendant appears to have had a fair and impartial trial, and there is a sufficiency of evidence to sustain the verdict and judgment. The judgment is, therefore, affirmed.

*Affirmed.*